UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :         MASTER FILE
IN RE BRITANNIA BULK HOLDINGS INC.      :    08 Civ. 9554 (DLC)
SECURITIES LITIGATION                   :
                                        :      OPINION & ORDER
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
Michael K. Yarnoff
Karen E. Reilly
Emily Rubin
Barroway Topaz Kessler Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087

Joseph A. Fonti
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

For the Underwriter Defendants:
William McGuinness
Peter L. Simmons
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980

For Defendants Fehrn-Christensen, Halsted, Khanbabi,
and Sinders:
Michael G. Bongiorno
Justina L. Geraci
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022

For Defendant Arvid Tage:
Mark S. Cohen
Sandra C. McCallion
Daniel H. Tabak
Cohen & Gresser LLP
100 Park Avenue, 23rd Floor
New York, NY 10017

DENISE COTE, District Judge:

This consolidated lawsuit, brought by lead plaintiff Edward Wahl ("Plaintiff") as a class action under the Securities Act of 1933 ("Securities Act"), alleges that the Registration Statement and Prospectus (collectively, "Offering Documents") accompanying a June 17, 2008 public offering of common stock in Britannia Bulk Holdings, Inc. ("Britannia" or the "Company") was materially misleading.  Plaintiff's claims center on certain alleged misrepresentations concerning Britannia's use of forward freight agreements ("FFAs"), financial contracts used to hedge against charter-rate volatility in the shipping market. Specifically, Plaintiff alleges that Britannia misstated or failed to disclose two material facts: (1) that Britannia used FFAs to hedge against increases, and not merely decreases, in charter rates, and (2) that the Company had entered into FFAs for purely speculative purposes.  Plaintiff argues that this undisclosed use of FFAs was not only "false and misleading," but also represented material information of considerable relevance to investors in evaluating Britannia's business.  Named as defendants are Britannia; Britannia's Chief Executive Officer, Arvid Tage; four other Britannia directors and senior officers (collectively, except for Tage, the "Individual Defendants"); and the four underwriters for the IPO (collectively "Underwriter

Defendants"). These groups are identified in detail further below.

This Opinion addresses the motions to dismiss that three defendants or groups of defendants -- Arvid Tage, the Individual Defendants, and the Underwriter Defendants -- have filed. Each of these three groups of defendants (collectively, "Defendants") asserts that the disclosures in the Offering Documents were not misleading, or in the alternative, not materially misleading. Moreover, each defendant also claims that the complaint merits dismissal because an affirmative defense of negative causation is evident on the face of the complaint. For the following reasons, the Defendants' motions are granted except as to the Section 15 claims against Fariyal Khanbabi and Arvid Tage.

<u>BACKGROUND</u>

I.   The Company and the IPO

The following facts are taken from the Consolidated Amended Complaint ("Complaint") of May 1, 2009, and the documents on which it relies, unless otherwise noted. Britannia, a Marshall Islands corporation conducting business from offices in the United Kingdom and Denmark, was a leading international provider of drybulk shipping and maritime logistic services. The majority of Britannia's business centered on transporting drybulk commodities in and out of the Baltic region, but the

3

Company also engaged in shipping services in Europe, South
America, East Asia, and Australia.  Britannia's expertise in the
Baltic derived from the icy conditions and short-haul nature of
the shipping routes of the region, conditions for which
Britannia's fleet was particularly suited.  As of June 2008,
Britannia's owned fleet included 22 vessels, comprising 5 ice-
class drybulk vessels, 8 non-ice-class drybulk vessels, 5 ocean-
going ice-class barges, and 4 ice-class tugs.  Aside from these
owned vessels, Britannia also "chartered-in" additional vessels
to increase its overall capacity.  In the twelve months prior to
March 2008, the Company expanded its chartered-in fleet from 18
to 51 vessels.

On June 17, 2008, Britannia launched an initial public
offering (the "IPO") of 8.33 million shares of common stock,
valued at $15 per share, for total proceeds of approximately
$125 million, excluding underwriters' discounts.  The IPO was
registered with the Securities and Exchange Commission ("SEC")
and conducted pursuant to a registration statement on Form F-1
filed on or about June 4, 2008, as amended on June 13 and June
16 ("Registration Statement"), and a prospectus on Form 424B
that became effective on June 18 ("Prospectus").[1]  The Prospectus

---

[1] The June 16 amended Registration Statement and the June 18
Prospectus contain almost entirely the same content, and the
page numbers between the two documents do not differ.

4

was signed by various Company officers and directors, including
Tage and the Individual Defendants.  Four underwriters
participated in the IPO: Goldman, Sachs & Co. ("Goldman Sachs"),
Banc of America Securities LLC ("Banc of America"), Dahlman Rose
& Company ("Dahlman Rose"), and Oppenheimer & Co. Inc.
("Oppenheimer").  Collectively, these four Underwriter
Defendants received more than $8.7 million in fees related to
the IPO.  Britannia's stock began trading on the New York Stock
Exchange under the symbol "DWT" on June 18, 2008.

     At the time of the IPO, Britannia's finances were
apparently in good condition.  In the years leading up to the
IPO, demand for Russian coal and other raw materials -- and
therefore, demand for drybulk transportation in the Baltic and
Northern Europe regions -- had been increasing substantially.
As a product of this rising demand for shipping and as a result
of Britannia's simultaneous expansion of its owned and
chartered-in shipping capacities, Britannia's revenues soared to
reach "historic levels" in early 2008.  Britannia's revenue for
the three months ending March 31 was $300.2 million, a sum
nearly four times greater than the $61.3 million it had earned
in the same three-month period in 2007.  Over the same period,
Britannia also expanded its offices and hired many new
employees, contributing in turn to a more than fourfold increase

in general and administrative expenses from the first quarter of
2007 to the same quarter in 2008.

## II.   Forward Freight Agreements

In the Offering Documents accompanying the IPO, Britannia
disclosed the Company's past attempts, and continued intent, to
manage the financial risk associated with its exposure to
charter-rate volatility by entering into drybulk forward freight
agreements ("FFAs").  FFAs are a type of financial hedging
instrument "involv[ing] contracts to provide a fixed number of
theoretical voyages at fixed rates, which contracts generally
range from one month to one year and settle monthly based on a
published index."  Simply put, parties enter into FFAs to hedge
against the possibility that market prices for shipping cargo
along certain generic trade routes might increase or decrease
relative to a fixed, contractual dollar amount.[2]  Britannia

---

[2] As described in a Form 6-K report update of October 28, 2008
("October Update"):

> A forward freight agreement ("FFA") is an agreement
> to pay the difference between a current price and the
> future price of moving a product from one location to
> another, or for the future price of hiring a ship
> over a period of time.  FFAs are used by ship-owners
> and charterers as means of protecting themselves
> against the volatility of freight rates.  For
> example, a ship-owner would typically sell FFAs to
> hedge against falling freight rates.  Similarly, a
> charterer would typically buy FFAs to fix shipping

reported that it had entered into eight FFAs in the three months ending March 31, 2008.  In the next three months ending June 30, Britannia entered into an additional twenty-nine FFAs.  As measured from June 30, 2008 -- around two weeks after the date of the IPO -- these FFAs were highly profitable for the Company. According to Britannia's Form 6-K quarterly report of August 4, 2008 ("August Report"), the Company reported net financial gains of $7.9 million from its FFAs for the three months ending June 30 and gains of $15.7 million for the six months ending June 30.[3]

The Company's use of FFAs is discussed repeatedly throughout the Registration Statement and Prospectus.  Each of the Offering Documents includes the following disclosure regarding the Company's use of FFAs in the "Risk Factors" section:

> Volatility in the shipping market requires constant adjustment of the balance between chartering out vessels for long periods of time and trading them on a spot basis.  We seek to manage and mitigate that risk through hedging activities in forward freight agreements, or FFAs.  <u>We are exposed to market risk in relation to our FFAs and could suffer substantial</u>

> costs.  Positions in FFAs can be closed out by buying or selling opposing positions.

_____

[3] Although it is not attached to the Complaint or other pleadings, this Court may take judicial notice of the August Report and consider its contents when evaluating the Defendants' motion to dismiss.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (noting that a court may take notice of "legally required public disclosure documents filed with the SEC").

<u>losses from these activities in the event that our
expectations are incorrect.</u>  We enter into FFAs with
an objective of economically hedging the risk of the
fleet, specific vessels or freight commitments.
However, there is no assurance we will be able to
successfully protect ourself [sic] from volatility in
the shipping market.  If we take positions in FFAs and
do not correctly anticipate charter rate movements
over the specified route and time period, <u>we could
suffer losses in the settling or termination of the
FFAs.  The performance of our hedging activities could
significantly increase the variability of our
operating performance</u> in any given period <u>and could
materially adversely affect our results</u> or operations,
cash flows and earnings.

(Emphasis added).  Later, in a section entitled "Qualitative and

Quantitative Disclosures About Market Risk," the Offering

Documents disclose regarding FFAs:

We are exposed to decreases in charter rates or
our inability to fully employ our chartered-in vessels
through COAs, time charters or spot charters.  <u>We
enter into drybulk forward freight agreements, or
FFAs, as economic hedges</u> relating to identifiable ship
or cargo positions and as economic hedges <u>of
transactions we expect to carry out</u> in the normal
course of our shipping business.  By utilizing drybulk
shipping FFAs, we attempt to manage our financial risk
associated with fluctuating market conditions.  When
entering into FFAs, we assume the risk that
counterparties may fail to meet the terms of their
contracts.  None of our derivative financial
instruments qualify for hedge accounting; therefore,
the net changes in derivative assets and liabilities
are reflected in current period operations. . . .
<u>Hedging activities in FFAs could lead to material
fluctuations in our reported net income</u> on a period-
to-period basis.  See "Risk Factors--Risks Related to
Our Business--Hedging activities in Forward Freight
Agreements (FFAs) subject us to trading risks and
<u>we may suffer trading losses that reduce our
earnings</u>". . . .

(Emphasis added).  Other passages related to FFAs, which repeat substantially the same language, appear elsewhere in the Offering Documents in sections entitled "Critical Accounting Policies," "Notes to Condensed Consolidated Financial Statements" (unaudited statements), and "Notes to Consolidated Financial Statements" (audited statements).

The Complaint alleges that the above-cited passages from the Offering Documents contained "materially false and misleading" statements concerning the Company's use of FFAs. The Complaint describes the Offering Documents as representing that the Company entered into FFAs to "(1) . . . serve[] as economic hedges to safeguard against decreases in vessel charter rates which related to identifiable ship or cargo positions, and (2) for transactions the Company expected to carry out in the normal course of its shipping business."  The Complaint then alleges that, despite this policy, Britannia "engaged in speculative trading in FFAs that was not designed to shield the Company from exposures to falling charter rates on identifiable cargo or shipping routes, but to 'play the market' instead, betting that historically high charter rates would continue to rise."

As evidence for his assertion, Plaintiff alleges that, on or about April 24, 2008, Britannia Bulk purchased an FFA from

Armada (Singapore) Pte Ltd. for the purpose of hedging against increases in charter shipping rates (the "Armada FFA").  The Armada FFA set a fixed contract price of $71,250 per day for a Panamax vessel[4] for the period of July through December 2008. The practical effect was such that, if charter rates rose above $71,250 between July and December 2008, Britannia would profit, but if they fell below $71,250, Britannia would be required to pay Armada the difference between $71,250 and the market index rate as set by the Baltic Exchange.  The contract's terms included "no identifiable ship or cargo."  As a result, the Complaint alleges that the Armada FFA was "contrary to the Company's disclosed use of FFAs to safeguard against falling charter rates" and against its stated policy of "provid[ing] an economic hedge for 'identifiable ship or cargo positions.'"

### III.   Post-IPO Developments

     Within a few months following the IPO, the drybulk shipping industry began to suffer the effects of a deepening global recession.  As demand for raw materials fell, so too did charter rates.  Britannia, whose "revenues were dependent on rate levels

---

[4] The Complaint describes a Panamax vessel as one of the three types of drybulk carriers whose prices for transporting raw materials are measured in the Baltic Dry Index (BDI), a time-charter average rate set daily by the London-based Baltic Exchange.

in the international shipping markets," suffered directly as a result.  Britannia's losses were further compounded by correlative losses from certain financial hedging arrangements. For example, as noted above, Britannia stood to suffer a loss on the Armada FFA if charter index rates fell below $71,250 between July and December 2008; in August 2008, the index rate was $51,965.78, and by October, it had fallen to $11,429.98.  As a result, by the end of October, Britannia had lost almost $3.25 million under the terms of the Armada FFA alone.

In a Form 6-K report update filed on October 28, 2008, entitled "Britannia Bulk Holdings Inc. Provides Operational and Financial Update" (the "October Update"), Britannia acknowledged that it was experiencing "severe financial difficulties" and that it expected to announce "a significant net loss" for the three months ending September 30.  The October Update stated that the primary driver for this loss was the "substantial decreases in dry bulk charter rates that occurred during the period."  The October Update also identified several other factors that "exacerbated" this loss, however, including: (1) an increase in the Company's chartered-in capacity, at a time when the market demand for capacity was significantly decreasing; (2) a recently concluded bunker fuel hedge that had become "uncompetitive"; and (3) losses from FFAs.  With respect to these FFA losses, the Company specifically noted:

> Since July 2008, the Company bought FFAs that <u>appear not to have been purchased to hedge identifiable ship or cargo positions.</u>  This resulted in the Company being more exposed to the falling charter rates and reduced overall demand for dry bulk shipping services than it would have been if its historic practice of using FFAs as economic hedges had been followed.  In marking these FFAs to market, <u>the Company expects to recognize a significant realized loss</u> for the three months ended September 30, 2008.  Cash settlement of such FFAs is scheduled to commence in the fourth quarter of 2008 and continue into 2009.

> An independent committee of the Company's Board of Directors has resolved to retain an external advisor to assist it in determining how the Company came to enter into these FFAs.

The October Update did not refer specifically to the Armada FFA or to any other FFA existing as of the date of the IPO.

The October Update also contained warnings concerning Britannia's expected near-term financial performance.  Most importantly, the Update disclosed that the Company had $158.0 million outstanding under a secured term loan facility concluded by a Britannia subsidiary in May 2008 and secured by twenty-two vessels in Britannia's owned fleet.  The Update warned that Britannia was exposed to a "very high risk of a . . . violation of one or more financial covenants" contained in the loan facility "in the near term," and that if such event occurred, it would likely trigger a default and the acceleration of the due date of all outstanding indebtedness.  The Update further cautioned that, even if the Company's negotiations with its

lenders proved successful at restructuring its financial arrangements, "it is unlikely that the Company's shareholders would realize much, if any, value."

Immediately following the release of the October Update, shares of the Company's stock declined 86% on unusually heavy trading volume from $1.90 to close at $0.27 per share.  This closing value was $14.73 lower than the $15.00 IPO price in June 2008, a drop of approximately 98%.

The following day, October 29, Britannia disclosed that it had been notified by its lenders that its subsidiary's debt obligations under the May 2008 lending facility would be accelerated and made immediately due.  Also that day, Britannia's common stock was suspended from trading on the New York Stock Exchange.  Thereafter, the value of the Company's shares declined to as low as $0.01 per share.

IV.   Procedural History

On November 6, 2008, Steve Button filed a class action complaint in this District alleging violations of Sections 11 and 15 of the Securities Act.  At the time of the suit's filing, the value of the Company's stock was $0.03 per share.  Button's suit was subsequently consolidated on February 18, 2009, with purported class actions brought by several other plaintiffs and

arising out of the same facts.  Edward Wahl was named Lead
Plaintiff in the consolidated case.

Plaintiff then filed this Complaint on May 1, 2009 on
behalf of all persons who purchased shares of Britannia stock
"pursuant or traceable to" the Company's IPO and who had
suffered injury thereby.  The Complaint alleges violations of
Sections 11, 12(a)(2), and 15 of the Securities Act on the basis
that the Offering Documents contained untrue statements of
material facts, failed to disclose material facts, and omitted
to state material facts necessary to make statements not
misleading.  In addition to naming Britannia and the four
Underwriter Defendants, the Complaint names Arvid Tage, Chief
Executive Officer and Chairman of the Board of Directors;
Fariyal Khanbabi, Chief Financial Officer and Director; and John
Sinders, Jens Fehrn-Christensen, and Soren Halsted, Directors.
Only Tage and Khanbabi are named as defendants under Section 15.
The Complaint does not allege fraud, but rather, only "innocent
and/or negligent conduct."  On June 12, 2009, all defendants
except Britannia filed motions to dismiss the Complaint.[5]

---

[5] On June 11, 2009, Britannia entered Chapter 15 bankruptcy
proceedings in the United States Bankruptcy Court for the
Southern District of New York.  Previously, on or about March
16, 2009, Britannia entered into administration in the United
Kingdom under the Insolvency Act of 1986.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009).  This rule "does not require 'detailed factual allegations,'" id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555); see also id. ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  For a plaintiff's claim to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570) (citation omitted); see also S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009).  Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950.

A court considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept as true all

factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted).  In evaluating a motion to dismiss in a securities class action, the court may review not only the complaint, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc., 493 F.3d at 98.

Plaintiff asserts three separate claims under Sections 11, 12(a)(2), and 15 of the Securities Act.  Section 11 provides that any signer, director of the issuer, or underwriter may be held liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ."  15 U.S.C. § 77k(a).  Section 12(a)(2) of the Securities Act allows a purchaser of a security to bring a private action for damages or rescission against his seller if that seller "offer[ed] or s[old] [the] security . . . by means of a prospectus or oral communication, which include[d] an untrue statement of a material fact or omit[ted] to state a

16

material fact necessary in order to make the statements . . .

not misleading." 15 U.S.C. § 77*l*(a)(2).[6]  Finally, Section 15

extends "control person" liability to "[e]very person who, by or

through stock ownership, agency, or otherwise . . . controls any

person liable under [Section 11] or [Section 12] of this title."

15 U.S.C. § 77*o*.

As similar pleading requirements apply to both Section 11

and Section 12(a)(2), the Court will consider them in tandem.

To state a prima facie claim under either Section 11 or

12(a)(2), a plaintiff need only prove that he purchased the

registered securities and that the registration statement or

prospectus, respectively, contained a material misstatement or

omission.  Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir.

2004).  Thus, unlike a securities fraud action brought under the

Securities Exchange Act, a plaintiff in a Section 11 or 12(a)(2)

action need not plead scienter, reliance, or fraud.  Id.

---

[6] The Underwriter Defendants assert in their motion to dismiss
that Plaintiff's Section 12(a)(2) claims must fail because of a
lack of privity between the Plaintiff and the Underwriter
Defendants.  As it has been concluded that Plaintiff's claims
against the Underwriter Defendants fail on both materiality and
loss causation grounds, there is no need to undertake a privity
analysis.

I.   Material Misstatement or Omission

In their motions to dismiss, Defendants argue that neither the Registration Statement nor the Prospectus contained material misstatements or omissions that could give rise to Securities Act violations.  Defendants assert that the FFA policies and practices of which Plaintiff complains were, in fact, disclosed in each of the Offering Documents when read fairly and as a whole.

The Securities Act countenances that both misstatements and omissions can give rise to liability.  For liability to attach, however, Sections 11 and 12(a)(2) require not only that the plaintiff identify a misstatement or omission in the registration statement or prospectus, but also that the plaintiff demonstrate that the misrepresentation was material. The test for determining whether an alleged misstatement or omission is material is "whether defendants' representations, taken together and in context, would have misled a reasonable investor."  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) (citation omitted).  This test has been restated on various occasions in slightly different form, in part depending on whether the alleged flaw is better characterized as a misstatement or as an omission.  An omission is material if there is "a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (citation omitted); see also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."). Likewise, a misstatement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." ECA, Local 134 BEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted) ("ECA"). A material fact can relate to past, existing, or prospective events. Sonesta Int'l Hotels Corp. v. Wellington Assoc., 483 F.2d 247, 251 (2d Cir. 1973).

These "reasonable investor" standards require a fact-intensive inquiry. "[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000). The Supreme Court has long observed that "the ultimate determination of materiality. . . . requires delicate assessments of the

inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him . . . ." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976); see also Basic Inc., 485 U.S. at 240 ("[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information"). Materiality is essentially a "mixed question of law and fact," ECA, 553 F.3d at 197, and as such, it is not ordinarily a question appropriate for resolution as a matter of law in a motion to dismiss. The Second Circuit has repeatedly held that "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. (citation omitted).

Nevertheless, circumstances exist in which a court may conclude that an alleged misrepresentation or omission is immaterial as a matter of law. One of these circumstances is where "the alleged misrepresentations [are] sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security." P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004). "The touchstone of the inquiry is not whether isolated statements within a document

were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Rombach, 355 F.3d at 173 (citation omitted); see also DeMaria, 318 F.3d at 180.  This principle, known as the "bespeaks caution" doctrine, is limited in its application to "forward-looking, prospective representations," however, and may not be used to caution against "[h]istorical or present fact -- knowledge within the grasp of the offeror."  Daum, 355 F.3d at 96-97; see also Rombach, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").  Moreover, the cautionary language relied upon by the party seeking to defeat materiality must "warn[] of the specific contingency that lies at the heart of the alleged misrepresentation" -- that is, "must relate directly to that by which the plaintiffs claim to have been misled." Daum, 355 F.3d at 97 (citation omitted).

Plaintiff has failed to plead a claim for relief that exceeds the minimum standards set forth above.  Plaintiff alleges, first, that Britannia failed to disclose that, "prior to and at the time of" the IPO, it used FFAs to guard against increases, and not merely decreases, in charter rates, and second, that Britannia had "engaged in speculative trading in

FFAs . . . to 'play the market.'"  These alleged deficiencies
identified by Plaintiff -- assuming they even constitute
"misstatements" or "omissions" -- are immaterial as a matter of
law and thus cannot sustain a "claim to relief that is plausible
on its face."  Iqbal, 129 S. Ct. at 1949 (citation omitted).
Each of Plaintiff's arguments will be addressed in turn.

A.   Increases Versus Decreases in Charter Rates

Plaintiff alleges that Britannia's Offering Documents were
materially misleading because they failed to reflect the reality
of how the Company was using FFAs "prior to and at the time of
the IPO."  As evidence for this assertion, Plaintiff points to
the Armada FFA, the contract purchased in April 2008, two months
prior to the IPO.  Plaintiff asserts that the purpose of the
Armada FFA was to "protect against rising rates," and thereby
concludes that Britannia had acted in a way "contrary to the
Company's disclosed use of FFAs to safeguard against falling
charter rates" and that it had not "adhere[d] to the Company's
stated policy."

Plaintiff's argument, which relies essentially upon two
isolated statements contained within the Offering Documents,
does not withstand meaningful scrutiny.  First, the Complaint
cites to language in the Offering Documents disclosing that
Britannia was "exposed to decreases in charter rates or [its]

22

inability to fully employ [its] chartered-in vessels through COAs, time charters or spot charters."[7]  Second, in his opposition papers, Plaintiff cites a passage -- from a part of the Offering Documents not directly concerned with FFAs -- that "the competitive COA, time charter and spot charter markets are characterized by highly volatile rates which may fall below the rates we pay to charter-in vessels, making operation of such vessels unprofitable."

As noted above, the prospectus must be read "as a whole." DeMaria, 318 F.3d at 180 (citation omitted).  Therefore, it is essential to consider the context in which these statements appear.  To that end, it must be noted that, in the same paragraph containing the language about "expos[ure] to decreases in charter rates," Britannia states that "[b]y utilizing drybulk shipping FFAs, we attempt to manage our financial risk associated with fluctuating market conditions."  Britannia

---

[7] Contracts of affreightment (COAs), time charters, and spot charters are types of contracts used in the drybulk shipping market.  A time charter is a contract made for a specific period of time, ranging from a week to several years; the party purchasing the contract pays a semi-monthly hiring payment to the owner and also covers all voyage-related costs (such as fuel and port dues), while the owner remains responsible for other basic vessel operating expenses and capital costs.  A spot charter is a one-voyage shipment contract for carriage of a specific amount and type of cargo from one port to another; the owner of the vessel remains responsible for all costs.  A contract of affreightment is a charter to carry multiple cargoes of a given commodity along the same route during a given period of time lasting anywhere from a few weeks to several years.

discloses that FFAs serve as "economic hedges relating to identifiable ship or cargo positions" as well as "economic hedges of transactions [Britannia] expect[s] to carry out in the normal course of [its] shipping business."

Elsewhere in the Offering Documents, the "Risk Factors" section discloses that "[v]olatility in the shipping market requires constant adjustment" of the Company's allocation of its resources between "chartering out vessels for long periods of time and trading them on a spot basis," and that the Company "seek[s] to manage and mitigate that risk through hedging activities in forward freight agreements, or FFAs."  The Offering Documents caution that if Britannia "do[es] not correctly anticipate charter rate movements over the specified route and time period," it could suffer losses on its FFA contracts.  The "Risk Factors" section employs entirely neutral language, containing no specific reference to either decreases or increases.

Read in context, the disclosures in the Offering Documents clearly countenance the possibility of both upward and downward variation in prices and not solely unidirectional movement.  The repetitive references to terms such as "volatility," "fluctuat[ion]," and "movements" are in stark tension with the Complaint's allegation that the Offering Documents only contemplated price decreases.  Likewise, the statement that

Britannia could "suffer losses" if it "t[ook] positions" that
"d[id] not correctly anticipate charter rate movements" clearly
discloses Britannia's aspiration to "anticipate charter rate
movements," whatever the direction.  Indeed, the only plausible
reading of these passages is to view them as a disclosure of
Britannia's intention, in order to "manage the financial risk
associated with fluctuating market conditions," to take whatever
positions would be necessary to neutralize that perceived risk.
These positions might hedge against charter-rate increases,
charter-rate decreases, or simply against intolerable
oscillation in charter rates in general.

Britannia's disclosures elsewhere in the Offering Documents
only serve to reinforce the above analysis.  Throughout the
Offering Documents, in discussing the kinds of business
transactions into which Britannia ordinarily enters -- the types
of transactions occurring "in the normal course of [its]
business" disclosed as subject to counterbalancing by FFAs --
the Offering Documents reiterate that Britannia not only
charters-in vessels from other companies over the long term but
also charters-out vessels to other parties at fixed prices.
Likewise, Britannia also enters into many short-term cargo
shipment contracts, such as contracts of affreightment (COAs),
spot charters, and time charters, for which it is also exposed
to both upward and downward fluctuations in market charter rates

25

depending on the contract.  Any reasonable investor reviewing the Offering Documents would understand from this discussion that the Company's price risk was not purely unidirectional.  As a result, an investor who thereafter reviewed the disclosures concerning FFAs would have been alerted to the possibility that Britannia would use FFAs to hedge against its exposure to "market risk" and "fluctuating market conditions" in either direction.

Further, the Offering Documents contain an abundance of cautionary language about Britannia's use of FFAs that Plaintiff simply ignores.  For instance, the Offering Documents disclose in their "Risk Factors" section that

> there is no assurance that we will be able to successfully protect ourself [sic] from volatility in the shipping market.  If we take positions in FFAs and do not correctly anticipate charter rate movements . . . , we could suffer losses in the settling or termination of the FFAs.  The performance of our hedging activities could significantly increase the variability of our offering performance in any given period and could materially adversely affect our results or operations, cash flows and earnings.

Likewise, in the section entitled "Quantitative and Qualitative Disclosures About Market Risk," the Company warns (among other things) that because FFAs do not qualify for hedge accounting, the FFAs would be marked to market each period and therefore "[h]edging activities in FFAs could lead to material fluctuations in our reported net income on a period-to-period

26

basis." These warnings, which specifically identify the risk of financial losses to Britannia if it "do[es] not correctly anticipate charter rate movements," "bespeak caution" in a way that puts a reasonable investor on notice of the possibility of adverse financial consequences.

Finally, the Complaint itself notes that, in the months leading up to the IPO, charter rates had been steadily rising to reach "historically high" levels. As a result, further upward price movements would be entirely consistent with recent trends in the marketplace at the time of the IPO. Given these well-known market conditions, any reasonable investor considering a purchase of Britannia securities would readily appreciate the possibility that charter rates could continue to increase, thereby adversely affecting those aspects of Britannia's business that become less profitable as charter rates rise.

In light of all of these considerations, the fact that the Offering Documents did not explicitly articulate every contingency in which the Company might use FFAs to hedge against volatility in the charter-rate market did not "affect the total mix of information" available to reasonable investors in Britannia securities, and therefore, was not materially misleading on its face. Rombach, 355 F.3d at 173 (citation omitted). On the contrary, federal securities laws direct issuers, in drafting their disclosure documents, to avoid

submerging important facts in a sea of excess detail.  See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991) ("[D]isclosure in a prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment.") (citation omitted).

The weakness in Plaintiff's theory is highlighted by the fact that the Complaint specifies only one FFA as being inconsistent with its characterization of Britannia's disclosures.  As of March 31, the last public reporting date before the IPO, Britannia had entered into eight FFAs; as of June 30, the next reporting date, Britannia had entered into a further twenty-nine.  Nevertheless, despite the existence of these contracts, Plaintiff has singled out only the Armada FFA as being inconsistent with the Offering Documents.  Plaintiff does not allege that any FFA other than the Armada FFA hedged against increases in charter rates.[8]

_____

[8] Plaintiff tries to blunt the impact of this deficiency through belated statements in his opposition papers that Armada FFA is "simply one example" of Britannia's misleading use of FFAs.  It is the Complaint's allegations and not vague assertions in briefing papers that must be able to withstand a motion to dismiss.  In any event, Plaintiff's opposition brief does not suggest that a further amendment of the Complaint would allow it to add even a second FFA as an example.

Finally, the Complaint does not even allege that the Armada FFA was itself a material part of Britannia's business as of the time of the IPO, such that any reasonably prudent investor "would consider it important" in making an investment decision. Basic Inc., 485 U.S. at 231.  Instead, in the context of Britannia's financial condition, as disclosed in the Offering Documents, any reasonable investor would have considered the Armada FFA a negligible factor.[9]

B.   Speculative Nature of the FFAs

Second, Plaintiff alleges that "[d]efendants failed to disclose or indicate that the Company had entered into FFAs that were speculative in nature and not for the disclosed purpose of hedging against . . . identifiable ship or cargo positions . . . ."  Specifically, the Complaint alleges that the Armada FFA was inconsistent with the disclosure contained in the Offering Documents insofar as "there was no identifiable ship or cargo in the Armada FFA," and thus was "contrary to the Company's stated policy that FFAs were used to provide an economic hedge for

_____

[9] Even when measured four months after the IPO, the losses resulting from the Armada FFA from its start date of July 2008 through October 2008 represented only $3.25 million, or slightly more than 1% of Britannia's revenue in the most recent quarter. With such a comparatively small loss, incurred on a single FFA among at least 37 such contracts, there is no "substantial likelihood that a reasonable [investor] would consider it important" in making a decision.  Basic Inc., 485 U.S. at 231 (citation omitted).

'identifiable ship or cargo positions' or any 'transactions we expect to carry out.'"

This assertion, too, fails to identify a material misstatement or omission capable of sustaining a Section 11 or 12(a)(2) claim. The Offering Documents themselves disclose that FFAs serve not only "as economic hedges relating to identifiable ship or cargo positions, [but also] as economic hedges of transactions we expect to carry out in the normal course of our shipping business." Although Plaintiff quotes the same in his Complaint, he apparently ignores the relevance of the second half of the sentence. An FFA could fail to "relat[e] to identifiable ship or cargo positions," but still fully comport with Britannia's practices as represented in the Offering Documents, so long as that FFA represented an economic hedge of a transaction the Company expected to carry out in the normal course of business. The Complaint does not describe any facts or even more generally allege that the Armada FFA could not or did not constitute a hedge against an anticipated transaction. Therefore, Plaintiff has failed to allege that the Armada FFA diverged from the normal course of Britannia's business affairs, as these affairs were described in the Offering Documents.

In an effort to salvage this prong of its Securities Act claims, the Complaint points to the October Update as evidence of the Company's supposed widespread speculation in FFAs that

was undisclosed in the Offering Documents.  Plaintiff quotes
language from the Update stating that "[s]ince July 2008, the
Company bought FFAs that appear not to have been purchased to
hedge identifiable ship or cargo positions," thereby exposing
the Company to greater financial losses than it would have
sustained "if its historic practice of using FFAs as economic
hedges had been followed."  On its face, however, the October
Update relates only to FFAs purchased "[s]ince July 2008," while
the IPO occurred the month before.  Nor does the October Update
refer elsewhere to the Armada FFA, nor to any other FFA in
effect as of the time of the IPO.  Again, by its own terms, the
Update relates only to FFAs into which the Company entered <u>after</u>
the IPO had already been concluded.  As such, the October Update
cannot support Plaintiff's allegations of a widespread
speculative practice, untethered to identifiable shipments or
anticipated transactions, that went undisclosed in the Offering
Documents.  The Update simply cannot be read to imply that
Britannia's prior statements regarding FFAs in the Offering
Documents were materially misleading "when made," which is the
relevant time for Section 11 and 12(a)(2) purposes.  <u>Rombach</u>,
355 F.3d at 175.

II.   Loss Causation

Even if Plaintiff had pled a prima facie case under Section 11 or 12(a)(2), the Complaint would still be subject to dismissal based on Defendants' affirmative defense of negative causation.  To be sure, the Securities Act does not require a plaintiff to plead loss causation as an element of its claim, and thus Plaintiff need not allege that the material misstatements or omissions in the Offering Documents were the source of his financial losses.  15 U.S.C. §§ 77k, 77l(2). Nevertheless, Sections 11(e) and 12(b) of the Securities Act provide that it is an affirmative defense to a Section 11 or 12(a)(2) claim, respectively, if the defendant "proves that any portion or all of the amount" of damages otherwise recoverable by the plaintiff "represents other than the depreciation in value of the subject security resulting from" the material misstatement or omission in the registration statement or prospectus.  15 U.S.C. § 77l(b) (governing Section 12(a)(2) claims); see also 15 U.S.C. § 77k(e) (containing roughly the same language with reference to Section 11 claims).  In other words, Defendants may assert the absence of loss causation as an affirmative defense to claims under Sections 11 and 12(a)(2) by proving that the allegedly misleading representations did not cause the depreciation in the stock's value.  In re Flag Telecom

Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35-36 (2d Cir. 2009);

McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d

Cir. 1995).  The Second Circuit has characterized a defendant's

burden of showing the absence of loss causation in the

Securities Act context as the "'heavy burden' of proving

negative causation."  Flag Telecom, 574 F.3d at 36 (quoting

Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 340 (2d Cir.

1987)).  "Although 'not insurmountable,' defendants' burden in

establishing this defense is heavy since 'the risk of

uncertainty' is allocated to defendants."  In re WorldCom, Inc.

Sec. Litig., 294 F. Supp. 2d 392, 408 (S.D.N.Y. 2003) (quoting

Akerman, 810 F.2d at 341).  Nevertheless, a court may dismiss a

claim based on an affirmative defense where "facts supporting

the defense appear on the face of the complaint, and it appears

beyond doubt that the plaintiff can prove no set of facts in

support of his claim that would entitle him to relief."  United

States v. Space Hunters, Inc., 429 F.3d 416, 426 (2d Cir. 2005)

(citation omitted); see also Staehr v. Hartford Fin. Servs.

Group, Inc., 547 F.3d 406, 412 (2d Cir. 2008).

     This case is the perhaps unusual one where negative

causation is apparent on the face of the Complaint and

Defendants have carried their burden of proof.  The Complaint's

theory of loss causation relies entirely on the disclosure in

the October Update.  It explains that

> [f]ollowing this disclosure, the Company's stock
> collapsed, eventually closing on October 28, 2008 at
> $0.27 per share, on unusually heavy trading volume.
> This closing price . . . represented a cumulative loss
> of $14.73, or over 98 percent, of the value of the
> Company's shares at the time of its IPO just months
> prior.

This allegation of losses "over 98 percent" ultimately obscures more than it illuminates, however, for several reasons.

First, as of the time that the October Update was released -- the sole disclosure upon which Plaintiff relies to establish loss causation -- Britannia's stock price had already fallen almost 90% from the IPO price of $15.00 to $1.90 per share. As such, the brunt of the collapse had already occurred even before the market was informed about Britannia's recent pattern of entering into FFAs in a way that was inconsistent with prior Company practice. Plaintiffs therefore have no choice but to concede that the bulk of their losses are not recoverable, because a "'price decline before disclosure may not be charged to defendants.'" McMahan & Co., 65 F.3d at 1049 (quoting Akerman, 810 F.2d at 342); see also ATSI Commc'ns, Inc., 493 F.3d at 106 (describing loss causation in an Exchange Act case as requiring a "proximate causal link between the alleged misconduct and the plaintiff's economic harm"); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (adopting Akerman's reasoning and

stating that "price declines [prior to public disclosure] may not be charged to Defendants under Section 11 or Section 12(a)(2)").  But see In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009) (concluding that an assessment of defendants' negative causation arguments was best left for summary judgment); Levine v. Atricure, Inc., 508 F. Supp. 2d 268, 273-74 (S.D.N.Y. 2007) (denying a motion to dismiss founded on loss causation grounds and stating while "[i]t is generally the case that declines in the value of shares prior to the public disclosure of previously omitted information may not be charged to the defendant. . . . this is not necessarily the case . . . where the negative undisclosed information leaks into the marketplace," and it is defendants' duty to prove that such leaks did not occur); In re Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) (noting that the principle that "the price decline before disclosure may not be charged to defendant" does not "relieve Defendants of their burden of establishing the affirmative defense of negative causation"); In re WRT Energy Sec. Litig., No. 96 Civ. 3610 & 3611 (JFK), 2005 WL 2088406 at *2 (S.D.N.Y. Aug. 30, 2005) (distinguishing Akerman's logic on the basis that it concerned summary judgment rather than a motion to dismiss).

Second, and as importantly, the October Update simply does not state what Plaintiff claims.  While Plaintiff asserts that

the Update is at least an indirect or "partial" admission by
Britannia that its Offering Documents had contained a material
misstatement or omission, the Update does not speak at all to
the Company's business activities prior to or at the time of the
IPO.  In other words, the October Update did <u>not</u> disclose even
"partially" that any of the FFAs in effect at the time of the
IPO had diverged from "its historic practice of using FFAs as
economic hedges."  Instead, the Report concerned only non-
conforming FFAs that had been purchased "[s]ince July 2008" --
that is, after the IPO was already completed.  As such, the fact
that Britannia stock fell further from $1.90 to $0.27 per share,
and eventually to $0.01 per share, following the October Update
is irrelevant because the October Update did not "reveal to the
market the falsity" of the Offering Documents.  <u>Lentell v.</u>
<u>Merrill Lynch Co.</u>, 396 F.3d 161, 175 n.4 (2d Cir. 2005).  Thus,
the Defendants have shown, based solely on the Complaint and the
Company's SEC filings, that this affirmative defense will
succeed even as to the small drop in share price that followed
the October Update.

     Third, it is worth noting that this straightforward reading
of the plain language of the October Update is entirely
consistent with the Company's intervening SEC filings after the
IPO.  Britannia's August Report -- a Form 6-K quarterly report
filed with the SEC -- reveals that the FFAs were a net financial

benefit to the Company at the time of the IPO rather than a cause of shareholder loss.  The August Report details that, for the three months ending June 30, 2008 -- the period during which the IPO occurred -- the Company sustained a net financial gain of $7.9 million from its FFA contracts, or approximately 2.2% of quarterly revenue.  For the six months ending June 30, these figures were $15.7 million in net gains and 2.4% of six-month revenue respectively.  Moreover, as of June 30, the net unrealized gains on open FFAs, when marked to market, amounted to $6.6 million and $13.5 million for the three months ending June 30 and the six months ending June 30 respectively.  These facts support Defendants' argument that an absence of loss causation is evident on the face of the Complaint and documents properly considered on a Rule 12(b)(6) motion.

Plaintiff argues in opposition that Defendants' arguments about negative causation "go to the extent and the amount of damages" and therefore are not ripe for adjudication at the motion-to-dismiss stage.  To the contrary, the facts, as alleged in the Complaint and as set out in the various public filings before this Court, demonstrate that Britannia's stock fell sharply before the purported corrective disclosure (the October Update) was issued; the October Update did not "correct" any statements made in the IPO documents; and the stock fell further as a result of the unrelated disclosures contained within the

October Update. The Defendants have shown that, as a matter of law, Plaintiff's losses were not the result of any corrective disclosure concerning the alleged misstatements or omissions in the Offering Documents that are identified in the Complaint.

## CONCLUSION

For the foregoing reasons, the Defendants' June 12, 2009 motions to dismiss the Complaint are granted except for the Section 15 claims against Tage and Khanbabi.

SO ORDERED:

Date:     New York, New York
          October 19, 2009

DENISE COTE
United States District Judge

38